**UNITED STATES of America,**

v.

**Anthony J. TRAVIA, et al., Defendants.**

Nos. CRIM. 01–0372–01, CRIM. 01–374M–01, CRIM. 01–374M–02, CRIM. 01–0375M–01, CRIM. 01–375M–02, CRIM. 01–377M–01, CRIM. 01–379M–02.

United States District Court, District of Columbia.

Nov. 30, 2001.

United States of America, for Plaintiff.

Stephen F. Brennald, Hyde & Brennwald, L.L.P., Silver Spring, MD, for Defendants.

### MEMORANDUM OPINION

THOMAS F. HOGAN, Chief Judge.

Pending before the Court is the government's appeal from the Magistrate Judge's bench ruling of July 31, 2001, dismissing with prejudice the criminal informations and complaints filed in these cases. In each information, the government charged the defendants with distributing nitrous oxide, commonly known as laughing gas, at a rock concert at RFK Stadium on June 9, 2001. The government specifically charged the defendants with unlawful distribution of misbranded prescription drugs, in violation of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331(a), 333(a)(1), 353(b)(1), and 352(f)(2). The Magistrate Judge dismissed the criminal complaints and informations after opining that the FDCA did not cover these individual defendants. The issues

raised in this appeal are whether nitrous oxide may be deemed to be a "drug" for the purposes of the FDCA, whether criminal liability under the FDCA may attach to these particular defendants, and whether the FDCA is constitutional if applied against these defendants. After careful consideration of the government's memorandum in support of its appeal, the defendants' consolidated opposition and the government's reply thereto, the hearing held in open court on November 14, 2001, the transcript of proceedings before the Magistrate on July 31, 2001, and the entire record herein, the Court will reverse the Magistrate Judge's ruling and reinstate these cases.

### I. BACKGROUND

According to the government, members of the D.C. Metropolitan Police Department ("MPD") and Special Agents from the Food and Drug Administration ("FDA") engaged in a joint investigation of illegal distribution of nitrous oxide at a rock concert at RFK Stadium on June 9, 2001. An undercover officer approached the defendants in the parking lot, handed them pre-recorded MPD funds, and in exchange received balloons containing nitrous oxide gas. The undercover officer then left the area and signaled arrest teams. The arrest teams moved into the area and arrested the defendants, who were subsequently identified by the undercover officer.

The government then filed one-count criminal informations against each of the defendants. The informations charge the defendants with unlawful distribution of misbranded prescription drugs, in violation of 21 U.S.C. §§ 331(a), 333(a)(1), 353(b)(1), and 352(f)(2).[1] On July 6, 2001, two of the

---

**1.** As discussed in greater detail below, section 331(a) prohibits "[t]he introduction or deliv-

defendants appeared before the Magistrate Judge to enter pleas of guilty. Rather than taking the guilty pleas, however, the Magistrate Judge *sua sponte* raised a question concerning whether nitrous oxide was a "drug" within the meaning of the FDCA. The Magistrate then continued the hearing until July 13 and requested briefing from the parties on the issue. On July 10, another defendant appeared before the Magistrate Judge on return of a bench warrant. At that time, the Magistrate raised another question in conjunction with these cases concerning whether the FDCA covered individuals who distribute misbranded drugs on the street, as opposed to medical practitioners, manufacturers, or other commercial entities that distribute drugs. She then directed further briefing on the issue.

At a hearing held on July 31, 2001, the Magistrate Judge issued a bench ruling in which she specifically answered her second question in the negative and dismissed the complaints and informations filed in these cases. 7/31/01 Tr. at 4–7.

## II. DISCUSSION

Section 331 of the FDCA prohibits, *inter alia,* "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a). The FDCA creates criminal liability for violations of such prohibitions. Section 333, for example, states that "[a]ny person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both." *Id.* § 333(a). In turn, the FDCA clarifies that "[t]he term 'per-

son' includes individual, partnership, corporation, and association." 21 U.S.C. § 321(e). In the context of this case, the FDCA deems a drug to be "misbranded"

[u]nless its labeling bears (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users, except that where any requirement of clause (1) of this paragraph, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement.

*Id.* § 352(f). The FDCA further deems misbranded a prescription drug dispensed without a proper prescription:

A drug intended for use by man which— (A) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; ... shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by

---

ery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a). "Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not

more than $1,000, or both." *Id.* § 333(a). Drugs are misbranded if they fail to bear adequate directions and warnings, *id.* § 352(f), or if they are prescription drugs dispensed without a prescription, *id.* § 353(b)(1).

oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.

*Id.* § 353(b)(1).

The issues raised in this appeal are (A) whether nitrous oxide may be deemed to be a "drug" for the purposes of the FDCA, (B) whether criminal liability under the FDCA may attach to these particular defendants, and (C) whether the FDCA is constitutional if applied against these defendants.[2]

## A. Whether Nitrous Oxide is a "Drug"

The FDCA defines the term "drug" to mean "articles (other than food) *intended to affect the structure or any function of the body of man* or other animals." 21 U.S.C. § 321(g)(1)(C) (emphasis added).[3] The intended use of an article thus determines whether it is classified as a "drug" for purposes of the FDCA. *See, e.g., Ac-*

*tion on Smoking and Health v. Harris,* 655 F.2d 236, 237–40 (D.C.Cir.1980) (upholding FDA's refusal to assert jurisdiction over cigarettes containing nicotine as a "drug" under 21 U.S.C. § 321(g)(1)(C) as not arbitrary, capricious, or contrary to law).

The parties' dispute how to properly discern the "intended use" of the nitrous oxide in this case. The government argues that the Court should look to the objective intent of the sellers in this case, which would permit the Court to view the totality of the circumstances—namely, the selling of balloons of laughing gas in the parking lot at a rock concert—surrounding the sale of the nitrous oxide here. *See, e.g.,* 21 C.F.R. § 201.128 ("The words 'intended uses' ... refer to the objective intent of the persons legally responsible for the labeling of drugs. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article.").[4]

---

**2.** The Magistrate Judge raised the first two issues, but only reached the second in dismissing this case. 7/31/01 Tr. at 4–7. The defendants raised the third issue, as well as addressing the first two, in their original motion to dismiss. The Court thus will address all three here.

**3.** The other definitions of a "drug" provided in the FDCA include:

(A) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; ... and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph.

21 U.S.C. § 321(g)(1).

**4.** The regulation continues:

This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the drug, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling

The defendants rejoin that "it is well established 'that the intended use of a product, within the meaning of the [FDCA], is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source.'" *Action on Smoking,* 655 F.2d at 239 (quoting *Hanson v. United States,* 417 F.Supp. 30, 35 (D.Minn.), *affirmed* 540 F.2d 947 (8th Cir.1976)). But, contend the defendants, the gravamen of the charge against them here is that there was no labeling on the balloons they sold. By the defendants' logic, therefore, without at least an allegation that representations were made by them in labeling or advertising the balloons, the nitrous oxide they sold cannot be considered a "drug" for the purposes of the FDCA.

■ The Court can find no support for the defendants' position. Labeling is not exclusive evidence of the sellers' intent. Rather, as the very language quoted by the defendants themselves states, "it is well established 'that the intended use of a product, within the meaning of the [FDCA], is determined from its label, accompanying labeling, promotional claims, advertising, *and any other relevant source.*'" *Action on Smoking,* 655 F.2d at 239 (emphasis added). The court in *Action on Smoking* went on to acknowledge that even *consumer* intent could be relevant, so long as it was pertinent to demonstrating the seller's intent: "Whether evidence of consumer intent is a 'relevant source' for these purposes depends upon whether such evidence is strong enough to justify an inference as to the vendors' intent." *Id.* Thus, while it may be true that " '[t]he vendors' intent in selling the product to the public is the key element in this statutory definition.'" *id.,* nothing limits the attempt to discern that intent to label-

ing or advertising. Instead, "the crux of FDA jurisdiction over drugs lay in manufactures' representations *as revelatory of their intent." Id.* (emphasis added); *United States v. 250 Jars, Etc., of U.S. Fancy Pure Honey,* 218 F.Supp. 208, 211 (E.D.Mich.1963) ("In determining that a particular article was intended to be used as a drug, a court is not limited to the labels on such article or to the labeling which accompanies it, but may look at all relevant sources."). Moreover, the focus on the seller's intent is premised, at least in part, upon the fact that the FDCA generally is concerned with protecting the public against false or misleading representations of the healing power of various articles placed into the stream of interstate commerce. This case is obviously unique in that, if the government's allegations are true, the sellers did not need to label or advertise their product, as the environment provided the necessary information between buyer and seller. In this context, therefore, the fact that there was no labeling may actually bolster the evidence of an intent to sell a mind-altering article without a prescription—that is, a misbranded drug. The Court thus concludes that from the surrounding circumstances of the sales alleged in this case that the government has made a sufficient showing that the defendants' intent to sell the nitrous oxide was to affect "the structure or any function of the body of man," 21 U.S.C. § 321(g)(1)(C), and thus, the nitrous oxide involved in this case is a "drug" for the purposes of the FDCA.

### B. Whether "Private" Individuals May be Criminally Prosecuted

The parties also dispute whether these particular defendants may be prosecuted

for such a drug which accords with such other uses to which the article is to be put.

21 C.F.R. § 201.128.

under the FDCA. The Magistrate Judge found that the FDCA does not cover individuals such as the defendants who sell or distribute or introduce into commerce nitrous oxide without any authorization to do so. 7/31/01 Tr. at 6. She thus answered her second question—"whether the Act proscribes the conduct which is alleged here, that is the introduction into commerce of a misbranded drug by a person whose activities are not regulated by the Act"—in the negative, holding that the FDCA "does not proscribe the conduct which is alleged here." 7/31/01 Tr. at 4. Underlying this ruling is the Magistrate's opinion that the legislative intent of the FDCA

> compels the conclusion that the Act is a regulatory provision intended for the protection of the public. While there may certainly be a well founded argument that distribution outside the regulated channels of commerce of any drug presents a hazard to the public, it is not through this statute that Congress has sought to address that hazard.

*Id.* at 5.[5] She therefore ultimately found "that the Act, read as a whole, compels the conclusion that Congress established a regulatory scheme, and not a criminal statute." *Id.* at 7.

The government argues that the Magistrate Judge clearly erred in so ruling. For support, the government primarily relies upon the plain language of the statute and the fact that nothing in it exempts individuals such as these defendants. Rather than addressing the plain language of the FDCA, the defendants point to the regulatory purpose of the statute and counter that the "provisions of the FDCA at issue in this case . . . apply to manufacturers of drugs, commercial retailers, and pharmacists and other professionals, but they do not apply to individuals such as defendants who allegedly sell nitrous oxide to consumers for personal consumption." Defs.' Opp'n at 3. In support of this narrower construction, the defendants contend that other provisions of the FDCA—such as the "good faith" and "advertising" exceptions to section 333, the hearing provisions of section 335, the injunctive relief of section 332(a), the seizure powers of section 334(a), and the debarment provision of section 335a—demonstrate the statute's inapplicability to individuals selling nitrous-oxide in a parking lot. *Id.* at 5. They also claim that the passage of the Controlled Substances Act ("CSA"), 21 U.S.C. § 841 *et seq.*, shows that Congress "intended private behavior to be regulated by the Controlled Substances Act instead of by the FDCA." *Id.* Finally, they argue that the FDCA is ambiguous, and a "rule of lenity" should thus apply. *Id.* at 6–7 (citing *Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) ("The Court has emphasized that the 'touchstone' of the rule of lenity 'is statutory ambiguity.' . . . Where Congress has manifested its intention, we may not manufacture ambiguity in order to de-

---

**5.** The Magistrate relied upon Section 11 (Drugs and Narcotics) from *Corpus Juris Secudum* to discern the legislative intent:

> The basic purpose of the Federal Food, Drug and Cosmetic Act is to protect the public health and safety, or as has been stated more specifically in various decisions, to secure the purity of drugs and to protect the consumer from the hazards of adulteration, mislabeling and misbranding

and from products that are dangerous, deleterious, illicit and noxious or have not been proven to be safe and effective for their alleged uses. In addition, the courts have stated the purpose of the Act is to inform purchasers of what they are buying and to prevent fraud.

7/31/01 Tr. at 5 (quoting *Corpus Juris Secudum* § 11).

feat that intent.")).[6]

■ The Court concludes that the Magistrate clearly erred. The plain language of the FDCA extends its coverage to these defendants. Section 333 states that *"[a]ny person* who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both." 21 U.S.C. § 333(a) (emphasis added). In turn, the FDCA states that "[t]he term 'person' includes *individual,* partnership, corporation, and association." *Id.* § 321(e) (emphasis added). The government has correctly noted that Congress did not explicitly exempt the defendants from these provisions; there is nothing in the FDCA's broad language that limits its coverage to professionals such as physicians, pharmacists, or commercial manufacturers. The Court further agrees with the government that this broader construction of the FDCA is bolstered by the fact that when Congress wanted to limit coverage, it expressly did so. *See, e.g.,* 21 U.S.C. § 333(b)(2), (3), and (4) (adding separate civil money penalties against "[a]ny manufacturer or distributor" that violates section 331(t)). And such a reading comports with the liberal construction demanded by the statute's purpose of protecting the public health. *See, e.g., United States v. Article of Drug . . . Bacto–Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969) ("The historical expansion of the definition of drug, and the creation of a parallel concept of devices, clearly show, we think, that Congress fully intended that the Act's coverage be as broad as its literal language indicates . . . . But we are all the more convinced that we must give effect to congressional intent in view of the well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health."). Finally, while neither side has cited case law directly addressing this issue, the government has cited several criminal cases in which it has brought charges against nonprofessionals for dispensing prescription drugs without a prescription. *See, e.g., United States v. Arlen,* 947 F.2d 139, 147 (5th Cir.1991) (affirming conviction of defendant body builder upon guilty plea to charges including a count of distributing in interstate commerce, with the intent to defraud and mislead, misbranded prescription drugs in the form of anabolic steroids, in violation of 21 U.S.C. §§ 331(a) and 333(b)); *United States v. Raymer,* 941 F.2d 1031, 1034 (10th Cir.1991) (affirming in part and reversing in part conviction of defendant on several charges, including three counts of introducing a misbranded drug into interstate commerce with the intent to mislead or defraud, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2)). The Court therefore concludes that the defendants in this case are covered by the FDCA.

## C. Whether the FDCA Is Unconstitutionally Vague or Nondelegable

Although the Magistrate Judge did not dismiss the informations and complaints on constitutional grounds, the defendants nonetheless advance an argument here, which they made in their original motions to dismiss, that if the FDCA proscribes the private conduct alleged in this case, it is void for vagueness and represents an

---

**6.** " 'Th[e] policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.' " *Bifulco,* 447 U.S. at 387, 100 S.Ct. 2247 (quoting *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958)).

unconstitutional delegation of Congress's power to enact criminal laws.

The Supreme Court recently stated that "[v]agueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). With respect to the notice basis, " '[i]t is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits ....' " *Id.* (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)). And as to the arbitrary enforcement basis, there is a " 'requirement that a legislature establish minimal guidelines to govern law enforcement.' " *Id.* (quoting *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855).

The defendants primarily rely on the former basis, arguing that the FDCA is unconstitutionally vague because it fails to give them sufficient notice that their behavior was proscribed. Defs.' Opp'n at 8. For support, the defendants rely upon two rather old cases. In *United States v. National Dairy Products,* the government indicted a dairy company and its vice president for violations of the both the Sherman Act, 15 U.S.C. § 1, and section 3 of the Robinson–Patman Act, 15 U.S.C. § 13a, which made it a crime to sell goods at "unreasonably low prices for the purpose of destroying competition or eliminating a competitor." 372 U.S. 29, 30, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). The defendants moved to dismiss the indictment, and the district court invalidated the Robinson–Patman Act as unconstitutionally vague and indefinite. *Id.* at 31, 83 S.Ct. 594. The Supreme Court reversed. *Id.* at 29–30, 83 S.Ct. 594. After articulating the strong presumption of validity that attaches to an Act of Congress, the Court clarified that "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Id.* at 32–33, 83 S.Ct. 594. Construing the statute as condemning sales made below cost, the Court held that the defendants could reasonably understand from the statutory language that the conduct described in the indictment was proscribed by the Act. *Id.* at 34, 83 S.Ct. 594. It also found that the additional element of predatory intent provided further definition to the prohibited conduct. *Id.* at 35, 83 S.Ct. 594. The defendants contend here that the FDCA does not "specify any intent and the government is trying to apply it to private individuals," in contrast to the officers indicted in *National Dairy Products.* Defs.' Opp'n at 8. The defendants also rely upon *United States v. 2600 State Drugs, Inc.,* 235 F.2d 913 (7th Cir. 1956). In that case, a drug company and several of its officers were convicted at trial of having sold, without a prescription, certain drugs in violation of the FDCA. *Id.* at 914. The Seventh Circuit Court of Appeals upheld the FDCA against the defendants' vagueness challenge, specifically holding that the "provisions of this Act are sufficiently definite to support a criminal charge for the violation of the Act." *Id.* at 915, 916–17. The Court further explained that "[t]he provision of the sections of the Act here under consideration were to bind pharmacists and to subject them to penalties in case of violations." *Id.* The defendants argue that these cases upheld the statute only because it was applied against pharmacists and manufacturers. Defs.' Opp'n at 8–9.

The defendants' reliance on cases such as *National Dairy Products* and *2600 State Drugs*, however, is misplaced. The courts did not address whether notice to individuals other than the pharmacists and manufacturers involved there is sufficient. Rather, the defendants appear to have erroneously read the *expressio unius est exclusio alterius* principle into these cases: they assert that because the courts found sufficient notice to the professionals involved there, other individuals such as the defendants here necessarily have not had sufficient notice. But the Court finds otherwise in this case. The FDCA prohibits the introduction into interstate commerce of misbranded drugs. 21 U.S.C. § 331(a). Drugs are misbranded if they fail to bear adequate directions and warnings, *id.* § 352(f), or if they are prescription drugs dispensed without a prescription, *id.* § 353(b)(1). The statute then states that "[a]ny person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both." *Id.* § 333(a). And it defines the term "person" to mean an "individual." *Id.* § 321(e). Congress has provided sufficient notice through these provisions; they are not so vague or standardless that the ordinary public is left uncertain as to what is prohibited. *City of Chicago*, 527 U.S. at 56, 119 S.Ct. 1849; *cf., e.g., United States v. Sullivan*, 332 U.S. 689, 695, 68 S.Ct. 331, 92 L.Ed. 297 (1948) (finding no ambiguity in the misbranding language of the Act and accordingly upholding provision requiring adequate directions for use and adequate warning against use); *United States v. Forester*, 346 F.2d 685, 685 (4th Cir.1965) (per curiam) (upholding provision deeming prescription drug to be misbranded if not dispensed pursuant to a prescription); *United States v. General Nutrition, Inc.*, 638 F.Supp. 556, 564 (W.D.N.Y.1986) (upholding provision requiring adequate directions for use and adequate warnings and noting unawareness of any case invalidating any provision of the FDCA "in any circumstance"). The Court therefore concludes that the FDCA is sufficiently clear to pass constitutional muster.

The defendants finally invoke a nondelegation argument: "Congress has seemingly delegated to the Food and Drug Administration the power to determine, through the tortuous process described [by the government] and decried by the Supreme Court in *Cardiff* that the conduct in which defendants were allegedly engaged was criminal." Defs.' Opp'n at 9.

But the government correctly notes that this Court has stated that "today the nondelegation doctrine is reserved for what Judge Leventhal has called 'the extremist instance.'" *Milk Indus. Found. v. Glickman*, 949 F.Supp. 882, 890 (D.D.C.1996) (quoting *Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO v. Connally*, 337 F.Supp. 737, 762 (D.D.C.1971) (three-judge court)). The Supreme Court has stated that to properly delegate authority, Congress must "'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Loving v. United States*, 517 U.S. 748, 771, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). "The intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes." *Id.* Without a much more substantial showing from the defendants, the Court can find no merit whatsoever in the defendants' conclusory position that the intelligible-principle rule has somehow been violated in this case. Rather, Con-

gress has provided in the FDCA clear proscriptions, as discussed above, that can be consistently followed by the FDA in enforcing them. This is not an " 'extremist instance.' " *Milk Indus.*, 949 F.Supp. at 890 (quoting *Amalgamated Meat Cutters*, 337 F.Supp. at 762).

## III.  CONCLUSION

For the foregoing reasons, the Court will reverse the Magistrate Judge's ruling and reinstate these cases.  An appropriate order will accompany this Memorandum Opinion.

### *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Magistrate Judge's bench ruling of July 31, 2001, dismissing these cases, is **REVERSED**.  It is further

**ORDERED** that these cases are hereby **REINSTATED**.

**SO ORDERED.**